UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LINDA A. MILLER, M.D., | 4:12-CV-04138-KES |
| Plaintiff, | |
| vs. | |
| HURON REGIONAL MEDICAL CENTER, INC., CY B. HAATVEDT, M.D., as a Member of its Executive Committee and Individually, and MICHAEL N. BECKER, M.D., as a Member of its Executive Committee and Individually, | MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART |
| Defendants. | |

Linda Miller, M.D., filed a complaint against Huron Regional Medical Center, Inc. (HRMC), Cy B. Haatvedt, M.D., and Michael N. Becker, M.D. The complaint was subsequently amended. Docket 81. The first amended complaint alleges the following causes of action against HRMC: breach of express contract, breach of implied contract, negligence, and defamation. The first amended complaint alleges the following causes of action against Dr. Becker and Dr. Haatvedt: negligence, defamation, and interference with business relationship and expectation. Defendants, HRMC, Dr. Haatvedt, and Dr. Becker, move for summary judgment on all claims asserted by Dr. Miller. Docket 132; Docket 133. Dr. Miller resists the motion. For the following reasons, the court grants the motions in part and denies the motions in part.

**Background**

Viewing the evidence in the light most favorable to the nonmoving party,

Dr. Miller, the facts are:

Dr. Miller is a general surgeon, who began working at HRMC in February

2004. Dr. Miller and HRMC entered into a contract in February 2009 that

established that Miller would be employed as an independent contractor for

HRMC. A Surgical Services Agreement and HRMC Medical Staff Bylaws govern

the terms of the contract.

The Medical Staff Bylaws create a Medical Executive Committee (MEC).

The MEC oversees any request from the HRMC administration or medical staff

that seeks review of a physician's quality of care. During the relevant time

period, Dr. Haatvedt, Dr. Becker, Dr. Jim Schwaiger, and Dr. Karl Blessinger

were members of the MEC.

On August 24, 2010, the HRMC Board of Directors passed a motion

requesting that the MEC conduct a review of Dr. Miller's medical records to

determine whether there were any medical trends of concern. Docket 135 – 2,

at 16. In response, on October 14, 2010, the MEC met with Dr. Miller and

determined it would review 100% of Dr. Miller's patient charts for a three

month period. The MEC sent a letter to Dr. Miller confirming the three-month

review and stated, "The charts will be reviewed for improvement in timeliness of

documentation as well as improvement in thoroughness and quality of

content." Docket 135 - 5. The MEC completed its review and did not report any

problem with the charts during this review period. Despite this finding, the Board of Directors decided to continue the review for an additional 90 days.

The MEC reviewed a grievance filed with the hospital on February 7, 2011. The grievance asserted that Dr. Miller performed an unnecessary surgery that resulted in a patient's physical complications. The MEC elected to send the case to ProAssurance Casualty Company for further review. Docket 135 – 2, at 8. At the time, ProAssurance was HRMC's professional liability insurance carrier.

On March 22, 2011, the HRMC Board of Directors requested that John Single, HRMC's Chief Executive Officer, meet with Dr. Miller "regarding medical record deficiencies, the need to achieve consistent compliance, and that future deficiencies may result in specific action by the Board." Docket 135 – 2, at 30.

In April 2011, Dr. Miller treated a patient suffering from acute pancreatitis. Dr. Miller performed surgery on the patient with the assistance of Dr. Haatvedt. The patient later developed complications and was transferred to Sioux Falls, South Dakota, for further care. The patient died in Sioux Falls from unknown complications.

On April 25, 2011, three members of the HRMC Board of Directors met with the MEC to discuss the internal and external reviews of Dr. Miller's work. Dr. Miller was not present during this meeting. After the meeting, the MEC decided that Dr. Blessinger should meet with Dr. Miller to discuss whether she would be willing to voluntarily reduce her surgical privileges.

In the afternoon of April 25, 2011, Dr. Blessinger met with Dr. Miller and informed her about the MEC meeting earlier in the day. Dr. Blessinger notified Dr. Miller that the Board of Directors requested that the MEC address Dr. Miller's recent issues associated with patient care. Furthermore, Dr. Blessinger suggested that Dr. Miller voluntarily reduce her surgical privileges. Even though the voluntary reduction in privileges was no guarantee that HRMC would maintain its contract with Dr. Miller, Dr. Blessinger informed Dr. Miller that there were no other viable options at that time. In addition, based on a conversation with Single, Dr. Blessinger informed Dr. Miller that a voluntary reduction in privileges was not a reportable event to the National Practitioner Data Bank (NPDB). The following morning, on April 26, 2011, Dr. Miller submitted her reduction of privileges paperwork to Single.

After Dr. Miller submitted her paperwork to Single, HRMC determined that Dr. Miller's voluntary reduction in surgical privileges was a reportable event. Single reviewed the NPDB Guidebook and sought the advice of Huron attorney Rodney Freeman. Single believed that the internal and external reviews of Dr. Miller's quality of care, coupled with a voluntary reduction in privileges, created a situation where HRMC was required to report the event to the NDPB. An Adverse Action Report, dated May 11, 2011, was filed with the NPDB. It stated that "Dr. Miller voluntarily surrendered a portion of her surgical privileges while the Medical Executive Committee was investigating her quality of care. The Board of Directors approved this surrender of certain

privileges April 29, 2011." Docket 135 – 8, at 3. Dr. Miller responded to the first

Adverse Action Report on June 6, 2011, and stated the following:

> In late April, I voluntarily reduced my privileges as I was concerned
> about the quality of care I was able to give. At that time, I was
> managing some personal issues along with a demanding call
> schedule of solo practice. I was working 24/7 and hadn't taken
> time off in several months. Since that time, the issues have been
> resolved, I took some much needed vacation time, and at the
> subsequent Board Meeting in May, I requested and was granted
> the majority of my privileges. (I did not request open Thoracic or
> Vascular as I don't have the need here.)

*Id.*

Following Dr. Miller's reduction in surgical privileges, there was some

confusion regarding whether Dr. Miller had any remaining privileges. On

May 18, 2011, Dr. Miller sent a letter to Dr. Haatvedt that requested the

approval of privileges relating to modified radical mastectomy. Docket 137 – 5,

at 4. The letter also requested that the board consider approving privileges

associated with elective abdominal cases. *Id.* Dr. Miller proposed two conditions

in support of obtaining the new privileges: (1) the procedure would be

completed in the presence of another general surgeon; and (2) the patient's

diagnosis, co-morbidities, and proposed surgery would be presented to

Dr. Haatvedt at least 24 hours before the surgery. *Id.* On June 3, 2011,

Dr. Miller sent a letter to the MEC that requested a myriad of additional

privileges. *Id.* at 5. The request suggested the imposition of the same two

conditions listed in Dr. Miller's first letter. The HRMC Board of Directors

approved the issuance of new privileges with the conditions suggested by

Dr. Miller.

Following the approval of new surgical privileges, HRMC sent two additional Adverse Action Reports to the NPDB. These reports indicated that Dr. Miller received new privileges with the imposition of the conditions listed above. HRMC sent the reports on July 21, 2011. Dr. Miller resigned from her position at HRMC on September 2, 2011.

### Standard of Review

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a factual dispute that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a motion for summary judgment, the court views the facts and the inferences drawn from such facts "in the light most favorable

to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## Discussion

### I.    HRMC's motion for summary judgment.

#### A.    Is HRMC entitled to summary judgment on the breach of implied contract claim.

South Dakota Codified Law 53-1-3 establishes that a contract is either "express or implied."  An express contract is "one, the terms of which are stated in words," whereas "[a]n implied contract is one, the existence and terms of which are manifested by conduct." *Id.* "A contract can either be express or implied, but not both." *Humble v. Wyant*, 843 N.W.2d 334, 343 (S.D. 2014) (citing SDCL 53-1-3). HRMC asserts that the court should grant summary judgment on count two of Dr. Miller's complaint, alleging a breach of implied contract, because the dispute involves a written Surgical Services Agreement and HRMC Medical Staff Bylaws. Because the parties signed and operated in accordance with the written agreement, HRMC's motion for summary judgment regarding count two of the complaint, alleging a breach of implied contract, is granted.

#### B.    Is HRMC entitled to summary judgment on the breach of express contract claim.

"It is well settled in South Dakota that 'a hospital's bylaws constitute a binding contract between the hospital and the hospital staff members.' " *Mahan v. Avera St. Luke's*, 621 N.W.2d 150, 153 (S.D. 2001). When analyzing whether a party has breached the bylaws, the court applies "the normal principles for

7

construction and interpretation of a contract." *Id.* at 154. Typically, a jury determines whether a party's conduct constitutes a breach of contract. *Harms v. Northland Ford Dealers*, 602 N.W.2d 58, 63 (S.D. 1999).

Dr. Miller alleges that HRMC breached the contract by disregarding the Bylaws' procedural mandates relating to corrective action. Specifically, Dr. Miller argues that HRMC and the MEC breached the Bylaws by requesting that Dr. Miller voluntarily reduce her surgical privileges without providing a formal hearing. In its motion, HRMC asserts that the corrective action procedures were inapplicable because formal corrective action proceedings were never instituted against Dr. Miller.

The contractual provisions relied upon by each party are found in the HRMC Medical Staff Bylaws. Bylaw 10.2 provides the criteria and procedures associated with corrective action. Docket 135 – 4, at 33. Bylaw 10.2(a) provides:

> Whenever the medical activities or professional conduct of any Member are, or are reasonably probable to be, contrary to the delivery of quality patient care or to effective hospital operations, corrective action against such Member may be requested by any member of the Medical Staff, Board, President/CEO or any employee of the Medical Center. Initiation of any corrective action proceedings shall be the responsibility of the Executive Committee.

Additionally, Bylaw 10.2(b) states that "all requests for corrective action shall be in writing, shall be made to the Executive Committee and shall be supported by reference to the specific activities or conduct which constitutes the grounds for the request." *Id.* According to Bylaw 10.2(d), within fifteen days of the date the request for corrective action is filed, the Executive Committee must

8

determine whether to dismiss the complaint or to appoint three physicians, who are not in direct competition with the affected physician, to investigate the charges. *Id.*

After the investigation is complete, under Bylaw 10.2(h), the Executive Committee may recommend the following corrective actions:

(i)   Reject or modify the request for corrective action;
(ii)  Issue a warning, a letter of admonition, or a letter of reprimand;
(iii) To impose terms of required clinical education, probation or consultation;
(iv)  Recommend reduction, suspension or revocation of clinical privileges;
(v)   Recommend reduction of staff category or limitation of any staff prerogative directly related to patient care;
(vi)  Recommend that the affected Member's Staff membership be suspended or revoked.

*Id.* at 34. According to 10.2(i), if the Executive Committee recommends formal action described in subsection (iv) through (vi), a physician is entitled to procedural rights provided in Article XI of the Bylaws. *Id.*

In Article XI, Bylaw 11.1 establishes that physicians are entitled to a hearing "upon the occurrence of any events as set forth in this Fair Hearing Plan." *Id.* According to Bylaw 11.2-1, the purpose of the Fair Hearing Plan "shall be to promote quality health care through the adoption of procedures to provide for reasonable investigations into questions concerning an individual's Medical Staff membership or clinical privileges[.]" *Id.* The Fair Hearing Plan also itemizes potential action from the MEC or HRMC Board of Directors that constitute grounds for a hearing:

(1)   Denial of initial Medical Staff appointment;
(2)   Denial of reappointment;
(3)   Revocation of Medical Staff appointment;

9

(4)     Denial of requested advancement in Medical Staff category;
(5)     Denial of requested initial clinical privileges;
(6)     Denial of requested increased clinical privileges;
(7)     Suspension or restriction of clinical privileges in excess of fourteen days
(8)     Suspension or restriction of Medical Staff membership in excess of fourteen days
(9)     Denial of requested committee affiliation;
(10)    Reduction in Staff category;
(11)    Individual application of or individual changes in mandatory consultation requirements;
(12)    Change in terms of probation if it impacts on the exercise of clinical privileges.

*Id.* at 35. According to Bylaw 11-2.1 (e) and (f), in the event that the MEC makes one of the recommendations provided above, the Chief of Staff must give notice to the affected physician, and the physician must request a hearing. *Id.* at 37.

HRMC did not institute formal proceedings against Dr. Miller. Despite HRMC's decision to forego formal corrective action proceedings, Dr. Miller argues that HRMC implemented corrective action through Dr. Blessinger's request to her to voluntarily reduce her surgical privileges. After the meeting where the MEC decided to request a voluntary reduction in privileges, Dr. Blessinger reached out to Dr. Miller in person. Dr. Blessinger describes the conversation with Dr. Miller as "I discussed with her that reducing her privileges might allow us to continue to have her practice medicine, give her time to regroup, get her career back in order, and potentially as far as certain board members, if something wasn't done would consider termination of agreement." Docket 135 – 20, at 9. Dr. Miller describes the conversation with Dr. Blessinger as more analogous to an ultimatum:

> [T]he Medical Executive Committee had met, had just met, the
> board had asked them to do something. He said that they were
> trying to appease the Board of Directors. And the best way to do
> this was for me to voluntarily reduce my privileges so that no
> action would be taken by the MEC. . . . I then asked him what
> alternatives I had. He said I had none."

Docket 149 – 2, at 3.

Viewing the facts in a light most favorable to Dr. Miller, a reasonable jury could conclude that HRMC failed to address its concerns regarding Dr. Miller's care in a manner prescribed in the Bylaws. A reasonable jury could find that the Board of Directors, during the April 25, 2011 meeting, formally requested that the MEC address the Board's concerns about Dr. Miller's care. A jury could also find that the MEC, through Dr. Blessinger, made a formal recommendation that Dr. Miller reduce her surgical privileges. Bylaws 10.2(i) and 11-2(a) create a procedural right to a hearing when the MEC takes action that results in the reduction of a physician's surgical privileges. Here, when Dr. Miller inquired about why she did not have an opportunity to attend the MEC meeting, Dr. Blessinger allegedly responded by saying, "[T]hey didn't have time. As it was, they spent two hours discussing this." Docket 149 – 2, at 3.

Even though HRMC did not institute a formal proceeding against Dr. Miller, a jury could find that the board demanded corrective action and the MEC responded by requesting that Dr. Miller reduce her surgical privileges. In this scenario, the Bylaws create a procedural right to a hearing where Dr. Miller could have challenged any concerns about her standard of care. Because there are factual disputes relating to whether HRMC complied with its

11

Bylaws, the motion for summary judgement pertaining to a breach of express contract is denied.

### C. Is HRMC entitled to summary judgment on Dr. Miller's negligence claim.

"In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." *Johnson v. Hayman & Assocs., Inc.*, 867 N.W.2d 698, 702 (S.D. 2015). HRMC does not argue that Dr. Miller failed to assert a prima facie negligence claim. Instead, HRMC argues that it is immune from Dr. Miller's negligence claim based upon the Healthcare Quality Improvement Act.

Immunity under the HCQIA is a question of law that may be resolved whenever the record is sufficiently developed. *Johnson v. SSM Healthcare Sys.*, 988 F. Supp. 2d 1080, 1087 (E.D. Mo. 2013), aff'd, 583 F. App'x 591 (8th Cir. 2014). HRMC urges the court to grant summary judgment regarding Dr. Miller's negligence claim by relying upon the immunity provision in 42 U.S.C. § 11137(c). Section 11137(c) states the following:

> No person or entity (including the agency designated under section 11134(b) of this title) shall be held liable in any civil action with respect to any report made under this subchapter (including information provided under subsection (a) of this section) without knowledge of the falsity of the information contained in the report.

The reporting requirement cited in § 11137(c) stems from 42 U.S.C. § 11133. Section 11133 establishes that every health care entity that accepts the surrender of clinical privileges from a physician "while the physician is under an investigation," must file a report with the Board of Medical Examiners. 42 U.S.C. § 11133(a)(1). The report should contain the name of the physician

and a description of the acts or omissions leading to the surrender of privileges. 42 U.S.C. § 11133(a)(3). "Thus, immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false." *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1334 (10th Cir. 1996).

In the Adverse Action Report filed with the NPDB, HRMC stated, "Dr. Miller voluntarily surrendered a portion of her surgical privileges while the Medical Executive Committee was investigating her quality of care. The Board of Directors approved this surrender of certain privileges April 29, 2011." Docket 135 - 8, at 3. HRMC argues that it was legally obligated to file the report with the NPDB because Dr. Miller was under an investigation as articulated in 42 U.S.C. § 11133. HRMC also asserts that even if Dr. Miller was not under an investigation as contemplated in the statute, Dr. Miller cannot meet her burden of establishing that HRMC filed the report with knowledge of the falsity of information contained in the report.

In response, Dr. Miller argues that the Adverse Action Report contained false information because HRMC merely conducted a routine review of her case files, not a formal investigation as contemplated in § 11133. Dr. Miller maintains that there is sufficient evidence to find that HRMC filed reports that contained false information and that HRMC was aware of the falsity.

Therefore, the court's inquiry is limited to two issues. First, could a reasonable jury find that HRMC's internal and external review of Dr. Miller was not an investigation as articulated in 42 U.S.C. § 11133(a)(1)(B)(i). Second, if

13

HRMC did not conduct what amounts to an investigation, is there sufficient evidence to find that HRMC was aware of the falsity of information filed with the NPDB.

**1.   A reasonable jury could find that Dr. Miller was not under an investigation at the time HRMC filed the reports with the NPDB.**

The term "investigation" as employed in the HCQIA is not defined by statute or regulation. *Costa v. Leavitt*, 442 F. Supp. 2d 754, 769 (D. Neb. 2006). But the Secretary of the Department of Health and Human Services published the National Practitioner Data Bank Guidebook, and it provides guidelines relating to the analysis. The Guidebook provides the following "Guidelines for Investigations:"

> 1.  An investigation must be carried out by the health care entity, not an individual on the staff.
> 2.  The investigation must be focused on the practitioner in question.
> 3.  The investigation must concern the professional competence and/or professional conduct of the practitioner in question.
> 4.  A routine or general review of cases is not an investigation.
> 5.  A routine review of a particular practitioner is not an investigation.
> 6.  An investigation should be the precursor to a professional review action.
> 7.  An investigation is considered ongoing until the health care entity's decision making authority takes a final action or formally closes the investigation.

Docket 135 – 22, at 11. If the hospital can satisfy the investigation requirements provided above, it must also have documentation to support its formal action of filing a report with the NPDB:

> A health care entity that submits an [Adverse Action Report] based on surrender or restriction of a physician's . . . privileges while under investigation should have contemporaneous evidence of an ongoing investigation at the time of surrender . . . Examples of acceptable evidence may include minutes or excerpts from

committee meetings, orders from hospital officials directing an
investigation, and notices to practitioners of an investigation.

*Id.*

HRMC submits that all seven guidelines provided in the NPDB
Guidebook support the argument that Dr. Miller was under an investigation.
HRMC cites the six month period where the MEC conducted a 100% review of
Dr. Miller's case files to ensure "improvement in timeliness of documentation
as well as improvement in thoroughness and quality of content." Additionally,
the MEC sent one case to ProAssurance to review whether Dr. Miller had
breached any standard of care while conducting the procedure in question. To
substantiate the existence of these two investigations as provided in the NPDB
Guidebook, HRMC points to the testimony of HRMC physicians and MEC and
Board of Directors meeting minutes.

In response, Dr. Miller asserts that HRMC's Medical Staff Bylaws reveal
that HRMC never completed necessary procedural requirements for the
internal reviews to reach the level of a formal investigation. Dr. Miller points
the court to Bylaw 10.2(d) which requires that the MEC create an Investigating
Committee to determine whether any alleged physician misconduct requires
corrective action. Because HRMC and the MEC did not convene a formal
investigative committee, Dr. Miller's argument aligns with NPDB guidelines 4
and 5, which state that a routine review of cases and physicians is not an
investigation under the HCQIA.

Dr. Miller also cites to the depositions of HRMC physicians that
distinguish internal reviews from formal investigations. Dr. Miller first cites to

15

Dr. Blessinger's statement that establishes the MEC was merely reviewing Dr. Miller's records to determine whether there were any trends that needed to be addressed. Docket 135 – 20, at 4-5. Second, Dr. Miller cites to Dr. Haatvedt's testimony that states that "we weren't investigating Dr. Miller. We were reviewing cases. That's different from a formal investigation." Dr. Haatvedt explains that "the investigation is a formal action where we have to appoint an ad hoc committee. A review is just – we're looking at practice standards and reviewing charts, listening to those kinds of things, but it's not an investigating committee." Docket 135 – 15, at 6. These statements by HRMC physicians and members of the MEC support the argument that the internal review was merely a routine practice, not an investigation.

As it pertains to the review conducted by ProAssurance, Dr. Miller argues that the external review was merely an insurance related process that assessed potential liability associated with a surgical procedure. Dr. Miller aptly cites the fact that ProAssurance did not provide a formal report regarding its analysis. Instead, ProAssurance conducted a phone interview with the reviewing physician and sent a letter to HRMC summarizing the conversation. Docket 135 – 11.

Relying upon guidelines provided in the NPDB guidebook, a reasonable jury could find that Dr. Miller was not under an investigation at the time she surrendered her surgical privileges. Multiple physicians downplayed the internal review of Dr. Miller's cases and distinguished that review from the type of action that would constitute a formal investigation. Moreover, a reasonable

jury could find that the review conducted by ProAssurance is more analogous to an external risk assessment than a formal investigation. Thus, viewed in the light most favorable to Dr. Miller, the first element of the immunity analysis does not support a finding of immunity.

### 2. A reasonable jury could find that HRMC was aware of the false information contained in the Adverse Action Report.

The "Health Care Quality Improvement Act confers immunity on any person who makes a report to the National Practitioner Data Bank 'without knowledge of the falsity of the information contained in the report.' " *Brown,* 101 F.3d at 1334 (citing 42 U.S.C. § 11137(c)). "Thus, immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false." *Id.*

HRMC relies upon two arguments to establish that it was not aware of the falsity of any information in the Adverse Action Report. First, HRMC submits that Single sought the advice of counsel, Rodney Freeman, to confirm the necessity of filing a report with the NPDB. Second, HRMC asserts that Dr. Miller can produce no evidence to establish that HRMC was aware of any false information in the Adverse Action Report.

To dispute HRMC's argument that relies upon the advice of counsel, Dr. Miller cites *Bucher v. Staley,* 297 N.W.2d 802 (S.D. 1980). In *Staley,* the Supreme Court of South Dakota stated the following: "To constitute a good defense, the advice of counsel must have been sought in good faith, from honest motives, and for good purposes, after a full and fair disclosure of all the

17

facts within the accuser's knowledge and information, and the advice must have been followed in good faith." *Id.* at 805. Based on *Staley*, Dr. Miller attempts to reject the value of Freeman's legal advice by asserting that "Freeman may have simply acquiesced in a conclusion Single had already come to when stating: 'The fact that [Single] advised me that [Miller] was voluntarily surrendering privileges while under investigation triggered the report.'" Docket 145, at 11.

As HRMC's Chief Executive Officer, Single knew that the MEC had not instituted formal corrective action proceedings against Dr. Miller. Without formal corrective action proceedings, Single was also aware that the MEC had not appointed a committee to conduct a formal investigation as required by the Bylaws. Moreover, according to Dr. Blessinger's deposition testimony, Single initially informed Dr. Blessinger that a voluntary reduction of Dr. Miller's privileges was not a reportable event. Viewing these facts in a light most favorable to Dr. Miller, a reasonable jury could conclude that Single provided Freeman with false information, namely that Dr. Miller was under an investigation, and that Freeman relied on this false information when he opined that HRMC needed to report Dr. Miller to the NPDB. As a result, HRMC may not be able to avail itself of the advice of counsel defense. And, Dr. Miller can argue that Single was aware of the false information included in the Adverse Action Report, namely that Dr. Miller was under an investigation when in fact she was not under investigation under HRMC's corrective action

18

proceedings or Bylaws. Thus, 42 U.S.C. 11137(c) does not provide immunity from the negligence claim. HRMC's motion for summary judgment is denied.

### D. Are administrative remedies a prerequisite to filing suit.

HRMC also submits that summary judgment is appropriate because Dr. Miller did not challenge the accuracy of the Adverse Action Report with the Secretary of the Department of Health and Human Services before filing suit. HRMC relies upon 42 U.S.C. § 11136, 45 C.F.R. § 60.21, and a United States District Court decision in *Straznicky v. Desert Springs Hosp.*, 642 F. Supp. 2d 1238 (D. Nev. 2009). 42 U.S.C. § 11136 requires the Secretary of the Department of Health and Human Services to provide procedures for a physician to dispute the accuracy of reports filed with the NPDB. 45 C.F.R. § 60.21 outlines the process for a physician to challenge the accuracy of an Adverse Action Report.

In *Straznicky*, a physician sought injunctive relief stemming from a hospital filing an Adverse Action Report. 642 F. Supp. 2d at 1244. The court held that the physician's claim was premature because the physician failed to challenge the accuracy of the report with the Secretary of the Department of Health and Human Services as provided in 45 C.F.R. § 60.14. *Id.* at 1245-46 (45 C.F.R. § 60.14 was renumbered in 2010 and 2013, without material change, to 45 C.F.R. § 60.21).

Dr. Miller disputes the application of *Straznicky* by arguing that the court's holding in *Straznicky* is limited to the viability of seeking injunctive relief. Further, Dr. Miller points the court to the decisions rendered in *Ritten v.*

19

*Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d. 696 (E.D. Mich. 2009), and *Zawislak v. Memorial Hermann Hosp. Sys.*, 2011 WL 5082422 (S.D. Tex. 2011). The *Ritten* and *Zawislak* courts held that the administrative remedies available to correct the information filed with the NPDB are not a prerequisite to filing suit. *See Ritten*, 611 F. Supp. 2d at 734 (stating the regulations provide that a physician "may" challenge the report through administrative channels, and thus "does not dictate such a course of action as a prerequisite to suit."); *Zawislak*, 2011 WL 5082422 at *2 (holding that a failure to proceed through the administrative process does not preclude filing suit).

The court finds the *Ritten* and *Zawislak* analysis persuasive. 45 C.F.R. § 60.21 states that a "[physician] may request that the Secretary review the report for accuracy." *Id.* Because the regulation employs permissive language and does not mandate that the physician pursue an administrative remedy, the court holds that Dr. Miller's failure to dispute the accuracy of the report does not provide a basis for granting HRMC's motion for summary judgment.

### E. Is HRMC immune from Dr. Miller's defamation claim.

According to SDCL 20-11-2, defamation is "effected by: (1) Libel; or (2) Slander." SDCL 20-11-3 defines libel as "a false and unprivileged publication by writing . . . which has a tendency to injure [a person] in his occupation." "Slander is a false and unprivileged publication, other than libel[.]" SDCL 20-11-4. HRMC asserts that the immunity provision in 42 U.S.C. § 11137(c) bars Dr. Miller's defamation claim.

20

The court's analysis regarding HRMC's immunity defense to Dr. Miller's negligence claim directly relates to the defamation claim. Viewing the facts in a light most favorable to Dr. Miller, a reasonable jury could conclude that the Adverse Action Report contained false information and that Single, acting on behalf of HRMC, was aware of the false information. As such, immunity does not apply here. HRMC's motion for summary judgment relating to the defamation claim is denied.

### F.  Can Dr. Miller present evidence relating to punitive damages.

South Dakota law allows plaintiffs to recover punitive damages "where the defendant has been guilty of oppression, fraud, or malice, actual or presumed[.]" SDCL 21-3-2. "Malice as used in reference to exemplary damages is not simply the doing of an unlawful or injurious act, it implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations." *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991).

Punitive damages "are not ordinarily recoverable in actions for breach of contract, because, as a general rule, damages for breach of contract are limited to the pecuniary loss sustained." *Hoffman v. Louis Dreyfus Corp.,* 435 N.W.2d 211, 214 (S.D. 1989). As HRMC notes in its reply brief, Dr. Miller does not dispute that punitive damages are unavailable in regard to her breach of contract claim. Accordingly, the court grants HRMC's motion for summary judgment relating to punitive damages stemming from the breach of contract claim.

As to the viability of punitive damages relating to the negligence and defamation claims, the court declines to provide a holding at this time. As articulated in *Lillibridge v. Nautilus Ins. Co.*, 2013 WL 870439 (D.S.D. 2013), near the end of Dr. Miller's case in chief, she can request a hearing outside the presence of the jury where the court will review the evidence to determine whether there is a reasonable basis "to believe that there has been willful, wanton, or malicious conduct by [HRMC]." *Id.* at *7. If Dr. Miller meets this evidentiary burden, the court will allow Dr. Miller to present evidence relating to punitive damages.

## II.   Dr. Becker and Dr. Haatvedt's motion for summary judgment.

Dr. Miller's claims against Dr. Becker and Dr. Haatvedt stem from their positions on the MEC. The potential conduct at issue includes the decision to request that Dr. Miller voluntarily reduce her surgical privileges and the decision to supervise procedures completed by Dr. Miller after she recouped some of her privileges.

### A.   Does 42 U.S.C. §11137 provide immunity for the conduct of Dr. Becker and Dr. Haatvedt.

Dr. Becker and Dr. Haatvedt argue that they are immune from suit based on the protection provided by 42 U.S.C. § 11137(c). Section 11137(c) provides immunity for the act of filing an Adverse Action Report with the NPDB. Because Dr. Becker and Dr. Haatvedt took no part in filing the report, the immunity provided by § 11137(c) does not apply to their conduct.

22

**B.    Does 42 U.S.C. §§ 11111 and 11112 provide immunity for the conduct of Dr. Becker and Dr. Haatvedt.**

42 U.S.C. § 11111 establishes a limitation on damages stemming from professional peer review. In part, the statute provides the following protection:

> if a professional review action[1] (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title . . . (A) the professional review body, [and] (B) any person acting as a member or staff to the body . . . . shall not be liable in damages under any law of the United States or of any State[.]

42 U.S.C. § 11111. To that end, 42 U.S.C. § 11112(a) provides that the professional review action must be completed in accordance with the following requirements:

1. In the reasonable belief that the action was in the furtherance of quality health care,
2. After a reasonable effort to obtain the facts of the matter,
3. After adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
4. In the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts. . . .

42 U.S.C. §11112(a). "A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." *Id.*

---

[1] 42 U.S.C. § 11151(9) defines professional review action as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician . . . which affects (or may affect) adversely the clinical privileges . . . of the physician."

The statutory presumption included in section 11112(a) places the burden of proof upon Dr. Miller in this analysis. Therefore, the court must review whether "a reasonable jury, viewing the facts in the best light for [Dr. Miller], [could] conclude that [she] has shown, by a preponderance of the evidence, that [HRMC's] actions are outside the scope of § 11112(a)." *Sugarbaker v. SSM Health Care*, 190 F.3d 905, 912 (8th Cir. 1999). In other words, the court must determine whether "[Dr. Miller] 'satisfied [her] burden of producing evidence that would allow a reasonable jury to conclude that [HRMC's] peer review disciplinary process failed to meet the standards of HCQIA.' " *Id.* (quoting *Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 839 (3d Cir. 1999).

In this case, a reasonable jury could find that HRMC and the MEC failed to satisfy the standards of the HCQIA. While the court accepts that HRMC likely complied with the first, second, and fourth elements of 42 U.S.C. § 11112(a), Dr. Miller has presented sufficient evidence to establish that HRMC failed to comply with the third element. The third element mandates that the HRMC peer review process provide a hearing or some other procedure to ensure fairness. The record establishes that HRMC and the MEC failed to do so. As such, the HCQIA does not provide immunity for Dr. Becker and Dr. Haatvedt in this case.

### C.   Does SDCL 36-4-25 provide immunity for the conduct of Dr. Becker and Dr. Haatvedt.

Dr. Becker and Dr. Haatvedt also argue that they are immune from

Dr. Miller's tort claims under South Dakota law. They rely upon SDCL 36-4-25,

which provides:

> There is no monetary liability on the part of, and no cause of action
> for damages may arise against, any member of a duly appointed
> peer review committee[2] engaging in peer review activity[3] comprised
> of physicians licensed to practice medicine . . . if the committee
> member or consultant acts without malice, has made a reasonable
> effort to obtain the facts of the matter under consideration, and
> acts in reasonable belief that the action taken is warranted by
> those facts.

It is undisputed that Dr. Becker and Dr. Haatvedt were members of a peer

review committee, they were licensed physicians, and their actions constitute

peer review activity. Therefore, state-law immunity will apply in this case

unless there is sufficient evidence to establish that Dr. Becker and

Dr. Haatvedt operated in any of the following ways: they acted with malice, they

failed to make a reasonable effort to obtain the facts of the matter, or they

failed to act with the reasonable belief that the action taken was warranted.

---

[2] SDCL 36-4-42 defines the term "peer review committee." In part, the statute provides "a peer review committee is one or more persons acting as any committee of a state or local professional association or society, any committee of a licensed health care facility or the medical staff of a licensed health care facility . . . that engages in peer review activity."

[3] SDCL 36-4-43 defines the term "peer review activity." In part, the statute provides "peer review activity is the procedure by which peer review committees monitor, evaluate, and recommend actions to improve the delivery and quality of services within their respective facilities . . . [T]he scope of the functions of a peer review committee include . . . (2) The grant, delineation, renewal, denial, modification, limitation, or suspension of clinical privileges to provide health care services at a licensed health care facility[.]"

### 1.   There is no evidence of malice.

Malice is not defined in the statute. Therefore, the court relies upon precedent analyzing the term in claims for defamation. "Because malice may not be inferred . . . there must be a specific showing of malice which requires proof of reckless disregard for the truth or actual malice." *Paint Brush Corp. v. Neu*, 599 N.W.2d 384, 398 (S.D. 1999). "The real test of whether a defendant's conduct is reckless so as to constitute actual malice is whether he in fact entertained serious doubts as to the truth of his publications." *Id.* (citing *Tibke v. McDougall*, 479 N.W.2d 898, 906 (S.D. 1992)).

Dr. Miller asserts two general allegations against Dr. Becker and Dr. Haatvedt in support of her claims against them. In regard to Dr. Becker, Dr. Miller cites a portion of Dr. Becker's deposition where he confirms that the MEC discussed a former patient of Dr. Becker and Dr. Miller. In the deposition, Dr. Becker confirms that he believes that Dr. Miller injured the bowel of one of their former patients. Docket 137 – 2, at 3. In support of this statement, Dr. Becker cites medical records and Dr. Miller's deposition associated with the lawsuit relating to that procedure. *Id.* In short, there is no evidence associated with the statement that can establish Dr. Becker made the statement with a reckless disregard for the truth. To the contrary, the record establishes that Dr. Becker believes that the statement is factual and is supported by Dr. Miller's own deposition in that case. As such, there is no evidence to establish that Dr. Becker made the statement with malice.

In regard to Dr. Haatvedt, Dr. Miller offers no actual evidence of any statement made by Dr. Haatvedt that was undertaken with malice. Dr. Miller's only vague allegation is that Dr. Haatvedt took part in the review of Dr. Miller's work when he also assisted or aided in the procedure being reviewed. As such, there is no evidence to establish Dr. Haatvedt made any statement that could be construed as one made with malice.

### 2.  The MEC made a reasonable effort to obtain the facts.

The timeline of events leading up to this dispute reveals that the MEC conducted a six month review of Dr. Miller's work. Furthermore, the MEC sent a specific case for external review to ProAssurance. Dr. Miller offers no evidence that could establish that the MEC, which included Dr. Becker and Dr. Haatvedt, failed to make a reasonable effort to obtain the facts that resulted in Dr. Miller's reduction in privileges. As such, this element also supports the application of immunity.

### 3.   Dr. Becker and Dr. Haatvedt acted with a reasonable belief that the actions taken were warranted.

As it pertains to this final element, there are two relevant actions at issue: (1) the process in which the MEC asked for the voluntary reduction in privileges; and (2) the process in which Dr. Miller obtained new privileges after the initial reduction.

The record is replete with issues associated with Dr. Miller's care. Moreover, it is clear that the MEC faced a difficult problem of crafting a solution that eased the concerns of the Board of Directors while also allowing

27

Dr. Miller to continue practicing medicine. Based on the testimony of the physician members of MEC, there is sufficient evidence to establish that the committee acted with the reasonable belief that a request for the voluntary reduction in privileges was a warranted action.

In regard to the process in which Dr. Miller recovered some of her surgical privileges, it is important to note that Dr. Miller proposed the oversight of her future surgeries. See Docket 135 – 9. Moreover, the Board of Directors approved Dr. Miller's application for privileges because it contained the condition. Thus, the imposition of surgical oversight was approved with a reasonable belief that the action was warranted.

Because Dr. Miller offers no substantive evidence that could contradict the application of immunity to the conduct of Dr. Becker and Dr. Haatvedt, the court finds that the protection provided by SDCL 36-4-25 applies in this case. As such, the court grants the motion for summary judgment relating to all claims asserted against Dr. Becker and Dr. Haatvedt.

## CONCLUSION and ORDER

Based on the forgoing, it is ORDERED:

HRMC's motion for summary judgment (Docket 132) is GRANTED in regard to the claim for breach of implied contract, but DENIED in regard to the claims for breach of express contract, negligence, and defamation.

It is FURTHER ORDERED that the motion for summary judgment asserted by Dr. Becker and Dr. Haatvedt (Docket 133) is GRANTED in full.

DATED November 5, 2015.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE